[Crim. No. 3371. Third Dist. May 6, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. GEORGE SEACH et al., Defendants and Appellants.

Harold J. Ackerman for Defendants and Appellants.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Barry Bunshoft, Deputy Attorney General, for Plaintiff and Respondent.

PIERCE, P. J.—George and Martha Seach, husband and wife, charged in two counts of (1) attempt to commit burglary and (2) conspiracy to commit burglary, were convicted of the attempt after a jury trial. Their motion for new trial was denied. Martha was granted probation. George was sentenced to state prison. Both appeal. Their principal contention is that the evidence is insufficient to support the verdict. We hold otherwise.

On September 5, 1961, shortly after 1 o'clock in the afternoon of a warm summer day, service station operator Karl Cook, whose station is at 4201 H Street in Sacramento, had his attention attracted to a woman, the defendant Martha, standing in front of a telephone booth located across the street near the corner of a market. Her back was to the booth and she kept looking up and down the street. He continued to watch.

He noticed a man in the booth, standing, then crouching, and seemingly doing repair work. He was not using the telephone. Although the day was very warm, the booth door was closed. After about five minutes the man came out of the booth. He was identified as defendant George. He spoke to Martha, then returned to the booth, closed the door and resumed the crouched position. Martha continued her position outside the booth. Cook telephoned the police.

A few minutes later the appellants left the telephone booth and walked east on the south side of ''H'' Street.

Shortly thereafter George, then separated from Martha, was

observed by a police officer who had, in the meantime, been given a description of the couple by Cook. When George saw the police officer he crossed the street and stepped into a plumbing supply store. Later he came out of the store and the officer stopped him for questioning. The officer observed that George was carrying a box with "a little pen light battery affair, with a periscope attachment" and a screw driver. The officer also observed that George had three needles stuck across the fly of his trousers just below the belt line. George was told to accompany the officer to his patrol car.

Meanwhile, another police officer (also furnished with descriptions of the two defendants by Cook) had discovered Martha on the corner of 45th and "H" Streets. Upon being questioned, Martha stated she was going to the fair. Asked if she knew the man standing on the corner of 46th and "H" Streets she said it was her husband. She stated that their automobile parked west on "H" Street was in need of repairs and they were looking for someone to repair it. When first asked whether she had been in front of the telephone booth she admitted that she had, but a few minutes later changed her answer, denying this.

George, having gotten into the patrol car, was seen to be bending over as if to get rid of something. The officers ordered him to get out and found three needles on the floor board of the car below where George had been sitting. George was then searched. Two lock picks were discovered in his right sock, and a homemade key was discovered in his shoe. Automobile keys were also found on his person. He denied he possessed a car. The couple were returned to the service station where they were identified by Cook. On a search of the neighborhood the officers found a Plymouth station wagon and inserted the key found on George, which unlocked the door. George then admitted possession of the car, first stated it was borrowed; later admitted he owned it.

A search of the car produced a complete set of tools, later identified as telephone coin box burglary tools. Also discovered was a binocular case containing 36 nickels, 42 quarters and 237 dimes. There were no pennies and no half dollars. The officers also recovered from George's person a list of phone numbers, subsequently identified as public telephones, also a list of addresses at which telephone booths were located.

A lock subsequently identified as one missing from a tele-

phone booth in Fullerton, California, was also discovered in the car.

Two witnesses from southern California, produced by the prosecution, testified to conversations with George before the incident which is here involved. Both of them testified to visits by George in which the latter had requested them (separately) to make telephone coin box burglary tools for him. One of them related a plan outlined to him by George in which his methods, including the posting of a woman as a lookout, were described.

At the trial George testified on his own behalf and freely admitted most of the evidence stated above, including the conversations with the two southern California witnesses. His story, however, was that he had tampered with this and other telephone booth coin box locks, intending to perfect a more secure lock.

The contention of Martha is that no more than suspicion prompted the jury's verdict against her. (*People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778].) But in the evidence against said defendant there is much more than suspicion. Her behavior in standing in front of the telephone booth looking up and down the street while her husband was engaged inside, and her act in conversing with him, before he resumed his activities within the booth; plus her false, contradictory and evasive answers upon being questioned by the police, all point so strongly to her guilt that the jury was justified in accepting this hypothesis. And this court would be unwarranted in interfering with its determination. (*People* v. *Newland, supra,* at p. 681.) In fact evidence supporting the jury's conclusion that Martha was standing as a "look out" for her husband was overwhelming.

As to the guilt of George, it is so clearly established that appellants' argument seems frivolous. They correctly state the rule that preparation for the commission of a crime is not enough; that there must be specific intent to commit a crime and a direct, unequivocal act toward that end. (*People* v. *Goldstein,* 146 Cal.App.2d 268 [303 P.2d 892].) The requisite intent, however, may be inferred from the facts and circumstances shown by the evidence. Once the design of a person to commit a crime is clearly shown, slight acts in furtherance of the design will constitute an attempt. (*People* v. *Fulton,* 188 Cal.App.2d 105 [10 Cal.Rptr. 319].) It is not necessary that the overt act proved should be the ultimate step towards the commission of the crime; it is sufficient

if it was the first or some subsequent step in a direct movement towards such consummation. (*People* v. *Gibson*, 94 Cal.App.2d 468 [210 P.2d 747].) In fact, to state otherwise would be tantamount to a holding that there could be no such crime as an *attempt* to commit burglary. Where the *ultimate* act is completed the crime is burglary. ▇ Within the foregoing rules the evidence was clearly sufficient to convict both defendants of the attempt. (*People* v. *Richardson*, 10 Cal.App.2d 379 [51 P.2d 1114].)

▇ With the burglary tools discovered during the search of defendants' automobile, and properly admitted in evidence, there was also admitted a lug wrench and ball peen hammer which had been found in defendants' car. There was no proof that these were implements designed to be used, or were actually used, in burglarizing telephone coin boxes. Therefore their relevancy as evidence is doubtful. But the district attorney in his argument to the jury admitted they had no relevancy, and it is not suggested how their admission in evidence could have had any prejudicial effect on the jury.

Appellants make a number of contentions of misconduct of the deputy district attorney asserted to have been committed either during the trial of the case or in argument to the jury. Only two of the charges have sufficient substance to be noticed.

▇ In his argument to the jury the prosecutor made statements to the effect that the evidence which had been produced established the guilt of the defendants. This was followed by suggestions that if the jury should acquit, acting upon the assumption that the defendants, having had to stand trial, had been punished enough, this could encourage them in the commission of further and continued coin box burglaries. This statement is urged as prejudicial misconduct. We do not so regard it.

▇▇ While it has been held improper to suggest to a jury that neighbors, friends or the public will criticize its members if a verdict of acquittal is given (*People* v. *Reilly*, 208 Cal. 385 [281 P. 606]), it has been held proper to inform jurors that crime, due to lax administration of justice, is on the increase and that it is the duty of the jury to do its duty. (*People* v. *Sliscovich*, 193 Cal. 544, 557 [226 P. 611]; 53 Am. Jur., § 465, p. 371.) ▇ There is a case (*People* v. *Williams*, 12 Cal.App.2d 207 [55 P.2d 223]) holding that the warning to a jury of the probable consequences of a failure to convict is improper. There is no statement in the opinion

of that case of just what the warning to the jury had been. The court, moreover, held that an admonition by the court to the jury had cured the error. Here we think the statement was not intended, and could not be construed, as a means either to intimidate the jury or to induce a conviction by improper means. It was essentially a reminder to the jury that if guilt was established it was its duty to convict. So construed it is a truism. ■ "The argument of the district attorney, particularly his closing argument, comes from an official representative of the People. As such, it does, and it should, carry great weight. It must, therefore, be reasonably objective." (*People* v. *Talle,* 111 Cal.App.2d 650, 677 [245 P.2d 633].) But courts, although always solicitous to preserve the jury against improper persuasion by the prosecution, should not carry protection to the point of absurdity.

■ Appellants contend that the trial court committed prejudicial error by denying its motion to suppress the testimony and report of an expert witness of the prosecution on the ground that the district attorney had failed to comply with a pretrial discovery court order. Early in the proceedings appellants (then represented by the public defender) had requested pretrial inspection of certain items. This request was complied with. Later, on December 13, 1961, the public defender moved for pretrial inspection generally.

On February 14, 1962, after hearing this motion, the court issued its order directing the district attorney to produce (*inter alia*) on or before February 19, 1962, "the reports of experts who examined the physical evidence taken from the defendants. . . ." At the time this order was made the case had been set for trial February 20, 1962, but before that date it was continued, at appellants' request, to March 20, 1962. When the court's prediscovery order was made, the report in question had been requested from the expert by the deputy in charge of the prosecution but it had not then been received. It was not received until March 26, 1962. When it was received, the deputy, aware of the court order, but interpreting it literally, did not furnish appellants' counsel with a copy. This was a deliberate act, the deputy taking the position that there was no continuing duty to furnish experts' reports received after February 19, 1962. He relied upon the opinion of the District Court of Appeal in *People* v. *Briggs,* (Cal. App.) 19 Cal.Rptr. 772, where it is stated that ". . . no case had been cited to us, and we are aware of none, which holds

that the prosecution must produce all documents which it obtains subsequent to a demand on the theory of a 'continuing demand.'" There was, however, also a predicating statement by Justice Herndon, the author of said opinion, that there was in the *Briggs* case no bad faith on the part of the district attorney. When the *Briggs* case reached the Supreme Court (*People* v. *Briggs,* 58 Cal.2d 385 [24 Cal.Rptr. 417, 374 P.2d 257]), the opinion of Justice Peters reiterated that orders requiring inspection of documents are not continuing orders. The reports in question in the *Briggs* case, however, were reports received during the course of trial—and, as stated above, no element of bad faith on the part of the prosecuting attorney was involved.

Here it seems clear that when the court made its order requiring delivery for inspection of all reports on or before February 19, 1962, it was attempting to cover all reports received by the prosecution before trial (which was then set for February 20, 1962). The deputy had requested this report of the expert and knew it would be forthcoming. Under these facts we cannot entirely eliminate bad faith.

We can, however, assert that appellants were not thereby deprived of a fair trial. The purpose of allowing the defense attorney discovery of a report such as this one is to furnish him with advance information of what the expert intends to testify to and afford him ample opportunity to prepare for cross-examining. After the trial had commenced, and on the day before this expert testified, appellants' counsel *was* furnished with a copy of the report. Although on oral argument appellants' counsel urged otherwise, we find nothing in the nature of this report to support the contention that he did not have ample opportunity to prepare for cross-examination. There was no denial to appellants of a fair trial. The frequency with which appellate courts must deal with unbecoming conduct on the part of a prosecuting attorney is irritating; particularly so when the case is one where guilt is so apparent that neither skill, zeal, nor overzealous advocacy could have played any part in the result. Irritation, however, must not lead us to forget the admonition of article VI, section 4½ of the state Constitution. The case here was presided over by an experienced and able trial judge who, as the record shows, was vigilant to protect the rights of defendants at every stage of the trial. They had a fair trial. Their guilt was proved beyond the peradventure of even an imag-

inary doubt. The only miscarriage of justice which could occur here would be to reverse.

The appeal of George Seach from the nonappealable order denying his motion for a new trial is dismissed. Judgment against him is affirmed. The order granting probation to appellant Martha Seach and suspending execution of the judgment is affirmed.

Schottky, J., and Friedman, J., concurred.

A petition for a rehearing was denied May 31, 1963, and appellants' petition for a hearing by the Supreme Court was denied July 3, 1963.